**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-640 (TFH)** |
| **v.** | : | |
| | : | |
| **DARRELL ALAN YOUNGERS,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Darrell Alan Youngers to 30 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

**I.    Introduction**

Youngers, a 32-year-old roofing contractor and Marine Corps veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on March 30, 2022, (ECF No. 45 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Youngers pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  A sentence of 30 days' incarceration is appropriate.

Aware that he was facing arrest, Youngers scaled a wall to reach the Capitol Building, filmed a confrontation between rioters and police, and entered through the Senate Wing Door within ten minutes of the initial breach.  After filming himself declaring "this is what a revolution motherfucking looks like," and collecting a souvenir piece of broken glass, he and codefendant George Tenney proceeded to the Rotunda Doors, which had not yet been breached.  Tenney opened the door for rioters, instigating the breach of the Capitol from the east side.  Youngers tried to open one of the doors too, encouraged entering rioters, and swatted at a police officer, but then took some steps to assist the now-outnumbered police, untangling an officer's radio from a bench and temporarily keeping some rioters away from that officer.  Before leaving the area, Youngers filmed another video celebrating the breach of the Capitol.  Back at a hotel, he filmed a video denying that there was violence at the Capitol and gave an interview wearing a full-face mask to conceal his identity.

The Court must also consider that Youngers' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  As Youngers, a former Marine trained in providing security should have known, he did not de-escalate the situation by joining

and chanting with the mob.  The defendant's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

The government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop, we turn to Darrell Youngers' conduct and behavior on January 6.

### *Defendant Youngers' Role in the January 6, 2021 Attack on the Capitol*

On January 2, 2021, Darrell Youngers set off on a solo road trip in his van from Liberty County, Texas, to Washington, D.C.  He reached D.C. on January 6, parked his van in a lot, and walked toward the rally.  On his walk to the rally, he met George Tenney and another individual (Individual-1) and struck up a conversation with them.  They went to the rally together and watched President Trump's speech.  Below is a photograph Youngers took, with Youngers on the left and Tenney on the right.



After attending the rally, Youngers marched toward the Capitol with Tenney and Individual-1. The group stopped next to the Capitol Grounds, near roadblocks labeled "STOP." Youngers reported on the status of the certification, noting that objections to Arizona's vote had been lodged. Youngers and his new friends also commented on the indications of unrest that they were seeing: a noise that sounded like a "cannon" going off, police, in Youngers' words, "hauling ass," and an announcement they heard over a police radio calling for officers who were protecting the windows to go to the West Side of the Capitol. Youngers commented, "something's going on," and asked the others, "you guys hear that on the radio, fire in the hole?" The group also noticed what they thought were SWAT teams approaching the Capitol.

Nonetheless, Youngers and Tenney advanced on to Capitol Grounds, and soon realized what was happening. In another selfie video, taken on the Grounds, Youngers said, "people have just stormed the front of the Capitol building, through tear gas…people aren't supposed to be up there, but they're there."

Youngers and Tenney continued to advance toward the building. When they got closer, they saw that the staircase leading up toward an entrance was clogged with rioters, so they scaled a wall to reach the Upper West Terrace instead. On the Upper West Terrace, Youngers filmed a confrontation between police and rioters outside the Parliamentarian Door. In the video, rioters

can be seen throwing objects at the police.   Youngers yelled, "watch your six!" a military expression commonly meaning, "watch your back!"  He joined chants of "USA!".

Youngers and Tenney then advanced to the Senate Wing Doors and entered the U.S. Capitol Building at approximately 2:19 p.m., less than ten minutes after the initial breach. Youngers high-fived another rioter as he entered:



Below is a screenshot from a video posted to social media of Youngers' entrance, showing Youngers (wearing the Marines jacket) on the left and Tenney on the right:



Once inside the Capitol Building, an alarm was audible.  Broken glass was visible on the floor.  Youngers picked up one such piece of broken glass as a souvenir.



Youngers also filmed a video in the area.  (Exhibit 1).  In the video, he rejoiced, "We are inside the Capitol Building.  It has been overrun.  The Capitol Building has literally been broken into."  He yelled, "this is what a revolution motherfucking looks like!"  He also declared, "by the people!"

He and Tenney walked down a hallway, climbed a set of stairs and advanced through the Rotunda to the East Foyer, where they arrived at around 2:25 p.m.  At the other side of the East Foyer were the Rotunda Doors, which led outside the building.  Rioters had not yet breached the Rotunda Doors, but they had amassed outside, and were struggling with the police.  Tenney entered the area first.  He approached the closed East Rotunda Doors and tried to push open the doors by shoving his body against them.  Youngers waited by the entrance to the Rotunda.

As Tenney succeeded in pushing one of the two doors open, J.G., an employee of the House Sergeant at Arms, ran toward Tenney, pushed him aside, and tried to close the door Tenney had opened.  Youngers moved forward the two struggling men, but moved back once J.G. pushed Tenney aside.  Tenney then ran back to the door and grabbed J.G.'s shoulder, appearing to push him into the doorframe.  Tenney and two other rioters began talking heatedly with J.G.  Youngers stood nearby and pulled a sign that had been standing in front of the door out of the way.  By then, rioters entering through the doors that Tenney had opened pushed J.G. back.

Youngers then moved next to the other door, which was still closed, and tried to force it open.  He did not succeed.

J.G., now more heavily outnumbered, left the area.  Tenney, who, with J.G. out of the way, was standing in the open door, reached outside.  At that time, Capitol Police Officer B.A. was outside the doors, and his arms locked with Tenney's as Officer B.A. came inside.  Tenney put his hand on Officer B.A.'s chest as the two separated, and Youngers moved in and touched Officer

7

B.A.'s arm, as if to move it away from Tenney.  Youngers appeared to put hands on Officer B.A, as if trying to separate him from Tenney, and Tenney swatted away Officer B.A.'s hand.  Officer B.A turned toward Tenney, and Tenney and Youngers shuffled backward toward the Rotunda, as if retreating.  Below are images from the confrontation.  In the first two photos, a yellow arrow points to Youngers, a red arrow points to Tenney, and a green arrow points to Officer B.A.:





In the photo below, the red arrow on the left points to Youngers.  The arrow on the right points to Tenney.



In the Rotunda, Tenney yelled, "stand up, patriots!  Stand up!"  He soon returned from the Rotunda to the East Foyer, approached the Rotunda Door again, and helped rioters entering the building move forward.  When a U.S. Capitol Police Officer entered, however, Tenney pushed him to the side.  Meanwhile, Youngers stood further back from the door and patted entering rioters supportively.  Another rioter pushed a metal bench toward Officer B.A., who had returned to defend the doors, and Officer B.A.'s radio cord became wrapped around part of the bench. Youngers untangled Officer B.A.'s radio and pushed the bench away.

Soon after, another rioter grabbed Officer B.A. from behind and threw him to the ground. Youngers and another rioter approached Officer B.A., but another police officer motioned for them to back off as he attended to Officer B.A.  As Tenney approached Officer B.A., Youngers and the

other rioter put their arms out to try to keep Tenney and other rioters away, but they then let Tenney through, and Tenney approached Officer B.A.



Tenney then returned to the Rotunda Doors, where officers and rioters were still struggling. He put himself in the doorframe, blocking the door from closing, and had to be pushed out of the way.  As more police arrived in the area and succeeded in closing the door to the rioters outside, Tenney verbally confronted them.

Youngers began filming the scene again.  He declared, "Two stories – two floors, multiple doors.  The Capitol Building has been breached."  He approached Tenney, put his arm around him, and directed him away from the doors, back toward the Rotunda.  An officer ordered Youngers and Tenney to go sit down in a hallway.  Youngers told the officer they were leaving.  Tenney and Youngers then returned the Rotunda and retraced their steps.

At about 2:32 p.m., 13 minutes after they had entered, Youngers and Tenney left the Capitol Building by climbing out through a window near the Senate Wing Door.  They returned to the area of the Upper West Terrace near the scaffolding in place for the inauguration, and then decided that the tear gas in the air was affecting them too strongly and decided to leave.

They returned to the area hotel where they were staying.  Youngers filmed a Facebook live video, in which he stated that he had just left the Capitol Building and returned to the hotel.  He said that "protestors were inside the Capitol Building."  He stated they were "not being violent," but "had forced their way in."  He said they were "not being aggressive with the cops," but there had been some "small skirmishes…little fights between the protestors and the security" but "no shootouts."

At the hotel room, Youngers, Tenney, and another individual who participated in the Capitol breach donned masks and hoods and participated in an interview regarding their conduct that day.  Youngers is on the left, and Tenney is on the right.



After January 6, Youngers also posted a picture to Facebook, in which an individual is stepping on the downed barriers and "AREA CLOSED" signs that had demarcated the restricted perimeter around the Capitol:



On January 8, Youngers sent text messages suggesting that pro-Trump forces were being framed for their role in the attack on the Capitol and that Antifa was actually responsible. He wrote, "'People in black were seen breaking windows at some point, and trump supporters stopped them and turned them into police." He also wrote, "all the images and videos of people posing in the capitol is staged."

*Youngers' Post-Plea Interview*

On July 25, 2022, as required by his plea agreement, Youngers participated in an interview with the government.  He recounted his actions on January 6 in detail and expressed regret that he had entered the Capitol.  As Youngers described, he had approached the building out of a sense of curiosity and a desire to witness the events first-hand.  He also said that he believed that if the building had been breached, people might be seriously injured, and thought that, given his background in the Marines, he could help triage the situation or provide assistance to the wounded. He explained that, after he scaled the wall to reach the Upper West Terrace and saw no such carnage, excitement and relief took over.

Youngers also described the incident at the Rotunda Doors.  He originally told the government that he had been concerned that rioters were getting crushed against the Rotunda Doors and approached them next to Tenney.  He did not recall discussing this concern with Tenney. Youngers said that he and Tenney had opened the door and, as soon as Youngers saw that police were on the other side, trying to defend the doors, he stopped trying to open them.  The government showed Youngers the surveillance video that showed Tenney approaching the doors on his own, opening them, and then confronting J.G. of the House Sergeant at Arms, all before Youngers tried to force open the other door (and did not succeed).  Youngers acknowledged that his memory must not have been correct and said that he did not recall the confrontation between Tenney and J.G.

Youngers said that, when Tenney had locked arms with Officer B.A., he had tried to separate them.  He said he was concerned about Officer B.A., who was badly outnumbered at the time, but once more police officers arrived (and one told Youngers that the police needed everyone to leave the area), he felt comfortable leaving, explaining that he had never wanted to stay in the

Building for long.  He agreed that Tenney's attitude toward the police was more confrontational and aggressive than his.

Youngers told the government that, when he filmed the video saying that there had not been violence in the building, he meant that he had expected to see more serious injuries and fighting if a building like the Capitol Building was being breached.  As in the video, he did not deny having seen what he called "skirmishes."  He explained that, when he filmed the video, he was not aware of, and had not seen, the serious violence that he acknowledged did take place that day at the Lower West Terrace and other areas.

On January 7, Youngers said he, Tenney, and Individual-1 had gone for a walk around the monuments on the National Mall.  Youngers felt sad about the people who had lost their lives, and about how the country had ended up in a situation where thousands of Americans had stormed their own Capitol, some fighting with police, some causing damage.

Feeling stressed about the possibility of getting arrested, Youngers then turned more and more to theories on social media that could absolve him and other rioters of responsibility, describing "going down a rabbit hole."  Since his arrest, however, Youngers said that he has tried to stay away from the YouTube pages where he had been following such theories.  When asked if he still believed that Antifa was responsible for the violence at the Capitol, Youngers stated that he now believes that it was unlikely (although he did not rule it out).  He stated that he regretted entering the Capitol, and that it would have "made [his] life easier" if he had not.

*The Charges and Plea Agreement*

On June 28, 2021, the United States charged Youngers by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2(D) and (G). On June 29, law enforcement officers arrested him in Houston, Texas. On October 22, 2021, the United States

charged Youngers and Tenney by a nine-count Indictment; Youngers was charged with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).   On March 30, 2022, pursuant to a plea agreement, Youngers pleaded guilty to Count Nine of the Indictment, a misdemeanor, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).   On June 30, 2022, Tenney pled guilty to Counts One and Two of the Indictment, charging him with violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1512(c)(2), both felonies.   His sentencing is scheduled for October 20, 2022.   By plea agreement, Youngers agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Youngers now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. Youngers must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).   As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a short sentence of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Youngers' individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Had Youngers personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Youngers is therefore not a mitigating factor in misdemeanor cases.

As a former Marine with experience providing security, Youngers should have known that his presence inside the Capitol would not be welcome on January 6.  Indeed, he admitted to the government that he realized he might be arrested but he entered the Capitol anyway.  And as he approached the Capitol, he filmed a video where he made his understanding clear: "people aren't supposed to be up there, but they're there."  He saw roadblocks and what he believed were SWAT teams.  He commented that the police were "hauling ass."  He heard what sounded like cannons going off.  He also overheard chatter on a police radio, including "fire in the hole" and a call for officers to come to the west side.  He scaled a wall to get to the Upper West Terrace.  He saw riot gear-clad police outside the Parliamentarian Door and watched rioters throw objects at them.  Once he entered the Capitol Building, he heard alarms blaring and saw broken glass on the door.  The red flags were plentiful.

Youngers told the FBI agents that he nonetheless approached and entered the Capitol Building because he was concerned that people inside might be injured, and he might need to triage, provide CPR, or otherwise assist.  He said that, if a building like the U.S. Capitol had been breached, he would have expected carnage to result.  He later acknowledged, however, that curiosity and excitement motivated him as well.

The government credits Youngers for acknowledging that, at a minimum, he had mixed motives.  The problem with his stated desire to help people, though, is that all of the video evidence contradicts it.  In Youngers' cell phone videos, he never says a word expressing concern about possible injuries.  He sounds excited about the people who had made it to the Capitol.  On the

Upper West Terrace, he watched rioters throw things at police, yelled to rioters to "watch your six!" (watch your back), and chants "USA!" at the police. Once inside the Capitol, he again takes the time to narrate and film the scene, and yells, with a joyous intensity, "this is what a revolution motherfucking looks like!" He stops to pick up a souvenir. None of this suggests a desire to care for the wounded.

And, if Youngers were motivated in part by a desire to assist the injured, it would represent a serious error in judgment, and a surprising one, given his military training. He should have known that, by contributing to the numbers of people illegally entering the Capitol, he was making the situation more dangerous. He should have known that the police wouldn't be able to look at him and recognize him as someone who was there to help – as an unauthorized individual, he would have represented a threat.

In the immediate aftermath of the riot, Youngers downplayed the violence and spread misinformation. First, he streamed a Facebook live video suggesting there was "no violence," using a definition of violence that would exclude acts such as throwing police officers to the ground and hurling objects at them, acts he had witnessed. Then, on January 8, he suggested that people wearing black (*i.e.*, members of Antifa) were responsible and that images inside the Capitol were staged – even though he himself had been inside the Capitol. The government credits Youngers' statement, though, that he has since distanced himself from the YouTube channels peddling false information and now has a more measured view of the events. Youngers does not appear to have continued to glorify or misrepresent the Capitol attack, as other defendants have, although his expressions of contrition have not been extensive. He first expressed remorse in his pre-sentencing interview with the government, where he described wistfully pondering on January 7 how our

nation's Capitol had been attacked; although, when asked how he feels about January 6 today, he emphasized the effect of his decision to enter the Capitol Building on his own life.

Some of Youngers' actions inside the Capitol are mitigating. The government also credits Youngers for assisting Officer B.A. by unwrapping his radio when it got caught in a bench and moving the bench aside. Youngers also kept rioters away from Officer B.A. after Officer B.A. was thrown to the ground. He also pulled Tenney away from a confrontation with officers and steered him away from the Rotunda Doors. Before Youngers did these things, though, he tried to open another one of the Rotunda Doors to rioters; had he succeeded, he could have facilitated the entry of a significant number of people. During Tenney's initial confrontation with Officer B.A., moreover, it is unclear whether he is trying to push Officer B.A. away from Tenney or whether he is trying push Tenney away from Officer B.A. Clearly, though, Youngers does not share Tenney's aggression against the police.

Accordingly, while the nature and the circumstances of this offense here are mixed, but the aggravating factors outweigh the mitigating. Youngers did not express an intent to engage in violence, nor did he continue to glorify violence or the rioters after the fact. He also took some steps inside the Capitol to reduce conflict with officers. Yet, he attempted to open one of the Rotunda Doors to rioters, ignored many, many red flags (and took a souvenir shard of glass home), took videos celebrating the "revolution" after capturing conflict between rioters and police, scaled a wall to arrive at the building and enter within ten minutes of the initial breach, swatted at Officer B.A. when he became entangled with Tenney, encouraged rioters entering the building with a pat on the back, and initially spread false information about the attack. On balance, the government believes that the seriousness of the offense supports a term of incarceration.

**B.  Youngers' History and Characteristics**

Youngers has no criminal history.  PSR ¶¶ 29-35.  He is recently married, with no children.  PSR ¶ 40.  According to the PSR, he served in the Marine Corps from August 2008 to August 2012, where he was deployed to Afghanistan and received an honorable discharge at the rank of Corporal.  PSR ¶ 53.  He is currently works as a roofing contract manager, although he did not provide the complete records, releases, and/or verifications relating to his employment and financial condition.  PSR ¶¶ 54, 57, 58, 59.   He has been compliant while on pretrial release.  Youngers' military service is laudable, but it also raises questions about his decisions on January 6.  As a former member of the Marine Corps, Youngers would have been aware that he had no right to enter restricted buildings, and indeed he acknowledged as much in his interview with the government.  He should have known that his unauthorized presence in the Capitol would not be welcome – particularly after the many red flags he saw.

The government credits Youngers for acknowledging that his memory of some of the events of January 6 was faulty and acknowledging that, at a minimum, helping the injured was not his only motivation to enter the Capitol that day.  As noted above, though, none of the other evidence in the case suggests that Youngers breached the Capitol to tend to the wounded.

Finally, the government notes that Youngers seems to spend periods of time living in his specially outfitted van.  When the government interviewed Youngers on July 25, Youngers indicated that he was working in Wisconsin and was not planning to return to Houston (where the PSR reports he resides) for several months.   If Youngers intends to continue to live part of the time in his van, the government's position is that home detention is not a practical solution, further supporting the request for a sentence of incarceration.

20

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

This case does not present a strong need for specific deterrence.  Youngers has no criminal history, has not engaged in additional misconduct, and appears to have moved away from his initial impulse to spread false information that has minimized January 6 or suggested

that rioters were framed.  To the government's knowledge, he has not continued to promote

violence, glorified or justified the riot, or encouraged others to do so.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles

in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This

Court must sentence Youngers based on his own conduct and relevant characteristics, but should

give substantial weight to the context of his unlawful conduct: his participation in the January 6

riot. Although those like Youngers convicted of misdemeanors are generally less culpable than

defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were

not minor crimes. A probationary sentence should not be the default.[4] *See United States v. Anna*

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression

that probation is the automatic outcome here because it's not going to be.") (statement of Judge

Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr.

9/17/2021 at 13 (statement of Judge Friedman).

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Youngers has pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with

significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the 30-day sentence in *United States v. Sorvisto,* 21-cr-320 (ABJ) provides a suitable comparison.  Like Youngers, Sorvisto entered the Capitol through the Senate Wing Doors within 15 minutes of the initial breach and would have seen and heard red flags – although it does not appear that he filmed videos remarking upon them, as Youngers did.  He did spend about 25 minutes inside the building (slightly more than Youngers), and later asked an associate who had posted pictures of him on social media to delete evidence.  He did not, however, climb a wall, try to open a door for rioters, or film himself celebrating the breach as a "revolution." Also, like Youngers, Sorvisto's conduct reflected certain mitigating factors – in his case, picking up litter.  There was also evidence that he followed law enforcement's instructions to leave, as Youngers claims he did.  *See* Gov. Sentencing Mem., *United States v. Sorvisto,* 21-cr-320 (ABJ), ECF No. 28 (filed Dec. 8, 2021).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46 (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607

(EGS), ECF 60 (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS), ECF 38 (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF 40 (D.D.C. July 15, 2022).[5] In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A. A Sentence Imposed for a Petty Offense May Include Both Incarceration and Probation.

#### 1. Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[6] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be

---

[5] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

[6] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part B *infra*.

sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[7] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form,

---

[7] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

## 2.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172

F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense.  *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation."  *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th

ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided

sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might

be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or

probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could

be sentenced to incarceration and supervision (in the form of probation).  No sensible penal

policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and

probation where, as here, the defendant is convicted of a petty offense.  Youngers pleaded guilty

to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol

Building, which is a "petty offense" that carries a maximum penalty that does not exceed six

months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d

1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty

offender may face a sentence of up to five years in probation).

### B. A Sentence of Probation May Include Incarceration as a Condition of Probation, Though Logistical and Practical Reasons May Militate Against Such a Sentence During an Ongoing Pandemic.

#### 1. Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[8]

## 2. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[9]

---

[8] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

[9] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Youngers to 30 days' incarceration, 36 months' probation, $500 restitution, and 60 hours of community service.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    ____/s/ *Alexis J. Loeb*____
ALEXIS J. LOEB
Assistant United States Attorney
Detailed to USAO-DC
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Fracisco, CA 94102
Alexis.loeb@usdoj.gov
(415) 436-7168