## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| vs. | **USDC Case: 21-0640(TFH)** |
| **DARRELL ALAN YOUNGERS** | |
| Defendant | |

### SENTENCING MEMORANDUM

Darrell Alan Youngers, through his attorneys from the Federal Public Defender, respectfully files this Sentencing Memorandum in support of his request for a sentencing of 12 months of probation. Accordingly, Mr. Youngers states and prays as follows:

### I.      Introduction

**Darrell Alan Youngers** appears before this Honorable Court after being named as defendant #2 in a two (2) defendant, nine (9) count indictment charging him on four (4) of those counts, all related to the incident in the Federal Capitol Building on January 6th, 2021. Mr. Youngers entered into a plea agreement and pled guilty to parading in the Capitol Building, infringing 40 U.S.C. § 5104(e)(2)(G).

1

The circumstances for these cases are unique. Because Mr. Youngers has plead guilty to a petty offense, the usual Guidelines are inapplicable and the parameters for sentencing are only constricted by statutory language. *See* U.S.S.G. 1B1.9 (2021). The U.S. Probation Office for this District is recommending a sentence of 36 months of probation for Mr. Youngers. The government, however, is moving for an additional 30-day sentence to the 36-month probationary term.

The government is asking for a so-called "split-sentence" of both incarceration and probation. Under the plain text of §§ 3551(b) and 3561(a)(3) and YYY, such sentences are not permissible. The Government's reading of the statute' is not the most reasonable as it disregards the history of its inception – although there is an express recognition on the Government's Sentencing Memorandum that the Sentencing Reform Act was passed with the intent to do away with split sentences[1] – but it also ignores 18 U.S.C. § 3551(b) parameters to imposing alternative sentences to individuals.

Thus, it is our position that this Honorable Court should sentence the defendant to a sentence of probation *or* a sentence of imprisonment, but not to both. For the reasons stated herein, we believe that the former is a sufficient, but not greater than necessary mean to satisfy Mr. Youngers' sentence.

---

[1] *See DE 55,* at p. 29.

We do not contest that this court will sentence a young man who participated in one of the most unique, massive protests in U.S. History to some term of punishment.  Similarly, we do not dispute that the protest became a mob, and in turn, mutated into a riot.  Mr. Youngers acknowledges the reality of the events of January 6th, and he has promised to stay as far away as possible from the Capitol in the future. He is both repentant and ashamed of his actions.

Notwithstanding, before this Honorable Court there is an individual who – like several thousand akin to him – responded to the summons of the highest ranked elected official in his country, as well as to those of several prominent U.S. Senators. Those elected officers beckoned their constituents to protect democracy under the guise of saving the republic by preventing Congress from certifying verifiably fraudulent votes.[2] Then President Trump affirmed that "[w]e've seen in the last few months, unprecedented amount of Voter Fraud."[3] As expressed by the President five days before the protest, the goal was not to thwart the Democratic process, but to protect it.[4]

---

[2] On January 4th, 2021 at 10:07 a.m. EST Donald Trump tweeted: "How can you certify an election when the numbers being certified are verifiably WRONG. You will see the real numbers tonight during my speech, but especially on JANUARY 6th…" https://www.presidency.ucsb.edu/documents/tweets-january-4-2021 (last visited August 28, 2022).

[3] On January 4th, 2021 at 10:13 a.m. EST Donald Trump tweeted: "We've seen in the last few months, unprecedented amounts of Voter Fraud. @SenTedCruz True!" *Id*.

[4] On January 4th, 2021 at 10:23 a.m. EST Donald Trump tweeted "We are not acting to thwart the Democratic process, we are acting to protect it. @SenRonJohnson" *Id*.

Mr. Younger, however misguidedly, wanted to protect democracy traveled to Washington, DC and the U.S. Capitol.  He did not approach Congress with the intent to commit crimes.  Instead, curious and worried about the legitimacy of the electoral process, he listened to the then President's rally cry.  Its purpose did not seem illegal at the time: "to demand that Congress do the right thing and only count the electors who have been lawfully slated."[5]  The action requested was specific: "… marching over to the Capitol building to peacefully and patriotically make your voices heard."[6]  The legal strategy behind the protest was clear: "All Vice President Pence has to do is send [the votes] back to the states to recertify and we become president and you are the happiest people."[7]

Mr. Youngers believed the President's promise. He went to D.C. and then, as instructed like everyone else, marched to the Capitol building to protest to save the United States.  Politics and deceit aside, the original purpose of his trip was legitimate.  It later degenerated into a blight in U.S. history.  Mr. Youngers is both ashamed and repentant of his role in the incident that led to his conviction.  Not only because of the consequences on his potential sentence, but also due the damage he

---

[5] Naylor, Brian, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, N.P.R., February 10, 2021.  https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial (last visited August 24, 2022).

[6] *Id*.

[7] *Id*.

inflicted on his country.  Mr. Youngers does not want to minimize the seriousness of his wrongdoing.  Yet, it is the combination of life experiences that make Mr. Youngers a worthy candidate for a probation sentence, a sufficient but not greater than necessary to comply with the statutory directives set forth in Title 18 U.S.C. §3553(a) 2(A)-(D).

## II.   The Court cannot impose a split-sentence

### a.  Statutory language does not authorize the imposition of a split sentence on petty offenses.

Once upon a time, courts could impose split sentences of both incarceration and probation. *See* 18 U.S.C. § 3651 (1983). This split-sentence provision did not apply to petty offenses (*i.e.*, those subject to a maximum prison sentence of six months or less).  Instead, it applied only to "any offense not punishable by death or life imprisonment, if the maximum punishment provided for such offense is more than six months." *United States v. Cohen*, 617 F.2d 56, 58 n.1 (4th Cir. 1980) (quoting § 3651).  For such offenses, the statute allowed a court to impose "a sentence in excess of six months" while ordering that the defendant serve "a period not exceeding six months" in prison and that "the remainder of the sentence be suspended and the defendant place on probation for such period." *Id.*

Congress did away with that practice when it enacted the Sentencing Reform Act and repealed the earlier version of that provision.  Today, 18 U.S.C. § 3551 describes the sentences that are authorized by federal statute:

> (b) INDIVIDUALS.—An individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553, to—
>
> > (1) a term of probation as authorized by subchapter B;
> > *(2)* a fine as authorized by subchapter C; ***or***
> > (3) a term of imprisonment as authorized by subchapter D.
>
> A sentence to pay a fine may be imposed in addition to any other sentence. A sanction authorized by section 3554 [(criminal forfeiture)], 3555 [(notice to victims of fraud)], or 3556 [(restitution)] may be imposed in addition to the sentence required by this subsection.

18 U.S.C. § 3551(b) (emphasis added).

Section § 3551 uses the term "or," indicating that probation is an alternative to incarceration.  *In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) (explaining that generally where a statute the disjunctive "or" it is "generally construed as setting out separate and distinct alternatives.).  Furthermore, it specifically provides that a "fine" maybe be ordered "in addition" to other punishment, but does not say the same for probation.  When "Congress includes particular language in one section of a statute but omits it in another," courts presume that "Congress intended a difference in meaning."  *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020).  Courts likewise refuse to "adopt an interpretation of a statute that renders

superfluous other provisions of the same law." *Id.* If these three different types of punishment (probation, fine, imprisonment) could all be used in combination with one another, as the government would have it, there would be no need for Congress to have said that "a fine may be imposed in addition to any other sentence" and that language would be superfluous.

This result is confirmed by 18 U.S.C. § 3561(a)(3): "IN GENERAL.—A defendant who has been found guilty of an offense may be sentenced to a term of probation unless. . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." This provision likewise ensures that probation is "an alternative to a term of imprisonment." *United States v. Nachtigal*, 507 U.S. 1, 2 (1993).

Of course, section 3561(a)(3) contains an exception for petty offenses, but that exception modifies only the "a different offense" clause. So a defendant with multiple petty offense convictions can receive a split sentence, but a defendant with a single count of conviction for a petty offense, as here, cannot.

As is often the case, rules and canons of statutory construction rigorously explain what is intuitively clear from this text. Justice Scalia's and Brian Garner's text on legal interpretation explains the relevant rule: "[w]ith postpositive modifiers, the insertion of a determiner before the second item tends to cut off the modifying

phrase so that its backward reach is limited." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).

Scalia and Garner also provide two particularly instructive examples:

- "Institutions or societies that are charitable in nature (the institutions as well as the societies must be charitable)"
- "An institution or **a** society that is charitable in nature (any institution probably qualifies, not just a charitable one)."

*Id*. at 148-49 (emphasis added). Section 3561(a)(3) is like the second example. "The defendant is sentenced at the same time to a term of imprisonment for the same or **a** different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). The qualifier "a" preceding a petty offense limits the reach of the postpositive modifier only to the "different offense" section of 3561(a)(3). As a result, the exception for petty offenses only applies when the term of imprisonment the defendant receives comes from a different, rather than the same, petty offense.

The rule of last antecedent reinforces this result. That rule allows for the interpretation of statutes that include multiple terms followed by a limited clause that "should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhardt v. Thomas*, 540 U.S. 20, 26 (2003). "The rule reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it." *Lockhart v. U.S.*, 577 U.S. 347, 351-52 (2016).

In *U.S. v. Pritchett*, 470 F.2d 455 (D.C. Cir. 1972), for example, the D.C. Circuit invoked this rule and reversed a defendant's conviction for carrying a concealable weapon.  DC law prohibited carrying concealed firearms, but it included an exception for "'jail wardens, or their deputies, policemen or other duly appointed law enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty." DC Code 22-2305.  The defendant was a jail warden, and the Circuit concluded that the exception applied to him regardless of whether he was on duty at the time of the charged offense (which he was not).  As the Circuit explained:

> [T]he construction which the Government advances would be contrary to a normal reading of the language of the statute. Ordinarily, qualifying phrases are to be applied to the words or phrase immediately preceding and are not to be construed as extending to others more remote. This Rule of the Last Antecedent is not an inflexible rule, and is not applied where the context indicates otherwise. Since there is no such indication here, we conclude that the application of the rule would be in keeping with the intention expressed in this statute.

*Pritchett*, 470 F.2d at 459.

The last antecedent rule and the postpostive modifier canon often go hand in hand.  For example, Scalia and Garner commend the DC Circuit's textual interpretation in *Pritchett*, but explain that postpositive modifier also properly resolved the case: "The court was right about the result and about the comma, but it was the **to** rather than the **or** that set the last phrase apart." Scalia & Garner, *supra*,

at 150 (emphasis in original).  The prohibition on concealed firearms did not apply to "'jail wardens, or their deputies, policemen or other duly appointed law enforcement officers, or **to** members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty.'" *Id.* (quoting D.C. Code Section 22-2305 (1932) (emphasis added).   The same result attains here.

Context confirms what we have already concluded.  If Congress had intended create an exception authorizing split-sentences for all petty offenses, it could have achieved that outcome much more naturally by replacing "the same or a different" with "an" or "any." A statute prohibiting a defendant sentenced to prison at the same time "for any offense that is not a petty offense" would have been simple and unambiguous.  But that is not the statute Congress wrote.  Instead, by dividing the universe of offenses into two categories (the "same" and "different"), the text implies that the two categories will be treated differently.

Furthermore, the government's interpretation would nullify § 3583(b)(3)'s prohibition on post-confinement monitoring for "a petty offense."   Since the Sentencing Reform Act of 1984, the statutory scheme has made clear that the proper mechanism for post-confinement monitoring is supervised release, not probation.  It does so by barring a dual sentence of imprisonment and probation for "an offense" (*see* § 3551(b), discussed above) and by authorizing instead a term of supervised

release following imprisonment (*see* § 3583). *See generally* S. Rep. No. 98-225, at 89 (1983).

Originally, under this new scheme courts could impose one year of supervised release after imprisonment for any misdemeanor offense, including a petty offense. *See* 18 U.S.C. § 3583(b)(3) (1985).  In 1987, however, Congress amended the statute to prohibit supervised release for "a petty offense." *See* Pub. L. No. 100-182, § 8, 101 Stat. 1266 (1987).  So under that provision as amended, a sentencing court can order one year of post-confinement monitoring via supervised release for a Class A misdemeanor but may not do so for petty offenses (Class B misdemeanors, Class C misdemeanors, and infractions). *See* 18 U.S.C. § 3583(b)(3); *see also* 18 U.S.C. § 19 (defining "petty offense").

Under the government's interpretation of § 3561(a)(3), the prohibition on supervised release for petty offenses in § 3583(b)(3) would become meaningless, because a court could simply escape the prohibition by ordering imprisonment plus probation for a petty offense.

But it is worse than that.  Under the government's interpretation, a petty misdemeanor defendant could end up worse off than a defendant who committed a Class A misdemeanor.   The petty misdemeanor defendant could be sentenced, for example, to six months of imprisonment and five years of probation, *see* § 3561(c)(2), whereas a Class A misdemeanant who received six months of

imprisonment could receive at most twelve months of supervised release, *see* §
3561(b)(3).

### b.  The Case Law To the Contrary Is Not Persuasive.

In recent months several written opinions in this district have gone the other
way on this issue.  *See United States v. Little*, 2022 WL 768685, at *3 (D.D.C. Mar.
14, 2022) (on appeal); *United States v. Sarko*, 2022 WL 1288435, at *1 (D.D.C. Apr.
29, 2022); *United States v. Caplinger*, 2022 WL 2045373, at *2 (D.D.C. June 7,
2022).  But with all due respect to those considered opinions, they get it wrong.

In *United States v. Caplinger*, the court concluded, for example, that the
postpositive modifier rule did not apply because the indefinite article "a" before a "a
different offense" is grammatically necessary.  *See* 2022 WL 2045373, at *5
(replying on reasoning also adopted in *Little*, 2022 WL 768685, at *5).  But the same
is true in the hypothetical offered by Garner & Scalia: "An institution or **a** society
that is charitable in nature."  *See* Scalia & Garner, *supra*, at 348-49.  Yet, the
postpositive modifier rule still applies.  *Id.* ("any institution probably qualifies, not
just a charitable one").

In *United States v. Little* the court concluded that the last antecedent rule did
not apply because the word "same" in § 3561(a)(3) serves as an adjective that
modifies the term "offense" rather than a stand-alone noun.  *See* 2022 WL 768685,
at *5.  But this is what is known as an "elliptical" construction where, to avoid

repetition, Congress wrote "the same or a different offense" rather than "the same offense or a different offense." This matter of convenience cannot bear the weight of statutory meaning that *Little* court would have it carry. In fact, the legislative history confirms that omission "offense" was a simple device to avoid repetition— rather than a device to impart critical statutory meaning—by summarizing the provision without that elliptical construction: "[S]ubsection (a)(3)" bars probation for a defendant "sentenced at the same time to a term of imprisonment either for the same offense or for a different offense." *See* S. Rep. No. 98-225, at 89 (1983).

In *United States v. Sarko*, 2022 WL 1288435, at *2 (D.D.C. Apr. 29, 2022), for its part, the court concluded that the government's reading was proper because the split-sentences for petty offenses purportedly "make[] sense," since "sentencing courts may not impose supervised release on petty-offense defendants." The exact opposite is true. It makes no sense for Congress to forbid post-incarceration supervised release for a single petty offense only to turn around and authorize post-incarceration probation (which could go on for much longer, as part of a vicious cycle) instead. In makes far more sense for Congress to have intended to give courts the latitude to pick and choose between probation and incarceration in the context of handling multiple petty offenses when it added the exception than for it to have effectively undone the entire petty offense carve out for supervised release. In any

13

event, it is not the Court's job do undo the judgment of Congress as enacted in the statutory text.

But even assuming this Court finds itself conflicted after reading these opinions from other courts, this a very simple way out of this textualist morass: lenity. Lenity enforces some of the justice system's noblest aims. *See Wooden v. United States*, 142 S. Ct. 1063, 1082 (2022) (lenity works to enforce "the ancient rule that the law must afford ordinary people fair notice of its demands . . . by ensuring that an individual's liberty always prevails over ambiguous laws") (Gorsuch, J., concurring); *id.* at 1083 (lenity also plays a "role in the separation of powers" by "preventing judges from intentionally or inadvertently exploiting 'doubtful' statutory 'expressions' to enforce their own sensibilities"). It may be among the more disfavored canons of construction in recent years. But it is not dead. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 547 (2015) (citing rule of lenity to support interpretation) (per Justice Ginsburg, with three Justices concurring and one Justice concurring in the judgment.); *United States v. Cano-Flores*, 796 F.3d 83, 93 (D.C. Cir. 2015) (same); *United States v. Guertin*, No. 1:21-CR-262 (TNM), 2022 WL 203467, at *3 (D.D.C. Jan. 24, 2022) (same); *Sandvig v. Barr*, 451 F. Supp. 3d 73, 88 (D.D.C. 2020) (same). And it exists precisely to resolve situations like this one where, after considering all the tools in the interpretive tool belt, the court is still conflicted about the proper construction of the statute. *See United States v.*

*Villanueva-Sotelo*, 515 F.3d 1234, 1247 (D.C. Cir. 2008) ("[W]here text, structure, and history fail to establish that the Government's position is unambiguously correct, we apply the rule of lenity and resolve the ambiguity in the defendant's favor.") (cleaned up).

In sum, a split-sentence is not authorized for a single petty offense. Accordingly, the court should refuse the government's invitation to impose one.

### and application of 3553 factors

### A. Mr. Youngers' conduct on January 6th 2021 is more mitigating than aggravating

As The Government acknowledges in its Sentencing Memorandum, Mr. Youngers' actions were not as violent as those of other individuals that entered the Capitol Building on January 6th of last year. *See* DE 55 at p. 19. There is no evidence to suggest that Mr. Youngers' acted in concert with other individuals in his travels to DC. Quite the opposite. He traveled alone to DC, by car. He did not bring any firearms, weapons, or any other objects to the event save his phone. He met the codefendant incidentally while listening to former President Trump's pleas to protect democracy, and walked with him from the rally to the Capitol Building.

Mr. Youngers was not a part of the initial crowd that gained access to the Capitol Building. Instead, he avoided confrontation with the officers protecting the access to the building by heading to a different access point. Mr. Youngers entered

the building through the Senate Wing Doors at 2:19 p.m., approximately 10 minutes after the initial group gained accessed.  Mr. Youngers did not confront any officers to enter the building, and walked through a door that had already been opened. While inside, Mr. Youngers accepts that he was a party to the mob mentality, albeit for a really short time.  He admits saluting other people entering the building, grabbing a piece of glass as a souvenir, and, more regrettably, that he attempted to open the Rotunda Doors on two (2) separate occasions.

However, Youngers' conduct does not evince any ill will towards security at the Capitol Building.  Quite the opposite.  At a minimum, Youngers assisted Capitol Building Officer B.A. twice, first by untangling his radio by moving a bench aside so the officer could regain movement; and, more importantly, by acting as a shield for B.A. while other individuals that entered the building moved on him after he fell to the floor. He further pulled codefendant Tenney from other officers, and moved him to exit the building.  His stay at the building was brief, as he is clocked leaving 13 minutes after entering the building.

The Government's assessment of Mr. Youngers' interactions in the original confrontation between Tenney and Officer B.A. is also untenable. *See* DE 55 at p. 19.  Youngers assisted B.A. not once, but twice following the original clash with Tenney.  It would be unreasonable to believe that their initial interactions stemmed from a different violent nature that was not in display.  The more rational reading of

his conduct during the initial contact with B.A. is the one consistent with his overall conduct towards B.A.: Mr. Youngers had no desire to engage in violence against Capitol Building Police, and was willing to put himself between those officers and other individuals to prevent violence from escalating.

Thus, we do not agree that the Government's interpretation of Mr. Youngers' actions, or intentions, is supported by the evidence.   The Government's position requires this Honorable Court to infer that Mr. Youngers acted upon a collective intent, and that his conduct should be judged by the actions of other individuals during the incident, specially, those of codefendant Tenney.   To that end, the Government proposes a nine (9) prong standard to gauge the "spectrum of fair and just punishment" for each defendant.   Strictly adhering to the Government's proposition, Mr. Youngers' mitigation supersedes any aggravating conduct:

| Prong Proposed | Mr. Youngers's conduct in relation to the analysis proposed by the Government |
|---|---|
| when, and how the defendant entered the Capitol Building building | 10 minutes after the initial breach at 2:19, through the Senate Wing Doors |
| whether the defendant encouraged violence | No |
| whether the defendant encouraged property destruction | No |
| defendant's reaction to acts of violence or destruction; | Stopped other individuals from inflicting violence on Capitol Building Police on at least three (3) separate occasions |

17

| | |
|---|---|
| **whether, during or after the riot, the defendant destroyed evidence** | No |
| **the length of the defendant's time inside of the building, and exactly where the defendant traveled** | Defendant was inside the Capitol Building for a total of 13 minutes, moving from the Senate Wing Doors towards the Rotunda and back |
| **the defendant's statements in person or on social media** | Defendant commented on social media two (2) days after the incident disclaiming violence inside the building |
| **whether the defendant cooperated with, or ignored commands from police officers** | Yes.   When told to sit down, defendant informed the Capitol Building Police that he would exit the building, and did so |
| **whether the defendant demonstrated sincere remorse or contrition** | Yes, defendant has been contrite since January 7th, 2021, when he walked through Washington and became overwhelmed by sadness of the injuries and deaths that occurred in the Capitol Building. |

It is clear then that eight (8) of the (9) factors proposed by the Government to ascertain the seriousness of each individual's conduct favors Mr. Youngers' request for a non-incarceration sentence.   In retrospect, Mr. Youngers' actions are undoubtedly irresponsible, but his overall conduct should balance in favor of leniency at sentencing.  The Government's analysis portrays a momentary lapse in judgment – by accessing the Capitol Building – followed by several moments of constraint and good exercise of judgment.   Under those circumstances, it is impossible to sustain the notion that Mr. Youngers' conduct merits incarceration as a penalty.

18

## B. Parity favors a non-incarceration sentence

The Government's assessment of the evidence against Mr. Youngers is paradoxical, at best.  It invites this Honorable Court to hold Mr. Youngers to a higher standard of conduct due to his military training, all the while accepting, *sub silentio* that said military training might be the cause for his lack of aggression towards security forces.  The Government's argument is problematic, since it creates a class of defendants – Veterans – who should receive disparate treatment and higher penalties as a result of their military training even though, like Mr. Youngers, did not utilize that training to facilitate their access to the Capitol Building.  The Government proposes no factual scenario where Mr. Youngers' military experience made this offense more likely or dangerous.  There is no evidence that Mr. Youngers' employed his training to aggravate matters, or to handle equipment or weapons.  Quite the opposite, his only reference of military language and training avoided further clashes between individuals and Capitol Building Office.

The Government also suggests that what Mr. Youngers should have known or done in relation to the events he was witnessing outweighs his actions in preventing further harm to at least two (2) officers that were attacked by the crowd.  It is impossible to ascertain what, under the stressful and uncertain circumstances of the event, what Mr. Youngers should have known, of done.  *See* DE 55 at p. 18.  We do know, however, that Mr. Youngers did not incur in any violence against the security

officers in the Capitol Building, and, when violence occurred in his vicinity, Mr.

Youngers took affirmative steps to stop or minimize it.

In terms of parity, neither the factual nor the statistical scenarios support the

Government request for imprisonment.  As to the facts:

- There is no evidence that Mr. Youngers engaged in preplanning the January 6th incident

- Mr. Youngers did not emit any inflammatory commentaries before the January 6th incident in any social media

- Mr. Youngers did not bring any weapons of defensive gear with him when he headed for the Capitol Building

- Mr. Youngers did not enter any private offices or rooms in the Capitol Building

- Mr. Youngers did not enter the Senate Chambers

- Mr. Youngers did not physically attack any person

- Mr. Youngers did not damage any property inside the Capitol Building

- Mr. Youngers prevented further harm to affect at least two (2) Capitol Police Officers

- Mr. Youngers only remained inside the building for 13 minute

- Mr. Youngers left the building immediately after being questioned by the Capitol Police

- Mr. Youngers has never called for political violence in any platform.

- Mr. Youngers responded all of the questions posed to him in his post guilty plea debriefing, including acknowledging that his memory of the incident was incorrect

We do not contest that parity principles would create a distinction between defendants who continue to entertain the idea of the illegitimacy of the U.S. Government after the 2020 election, and those who do not.  Those individuals who continue to advocate for divisiveness that might lead to further violence against the Government are certainly in a different class of defendant for punishment purposes. Same can be said for those who planned an attack or engaged in acts of violence during the January 6th, 2021 incident.   Mr. Youngers is not in any of those classes. He has been contrite and remorseful, and has promised to not approach the Capitol Building ever again.

As to similarly situated defendants, this District Court has sentenced 157 individuals for the same conduct for which Mr. Youngers was convicted. Only 59 of the 157 were sentenced to imprisonment.[32]  More importantly, however, only 27 of the 157 – or 17% of the sentenced for infringing 40 U.S.C. § 5104(e)(2)(G) – were sentenced to a split sentence that would entail some form of incarceration, or inpatient treatment, including those who were imprisoned as a condition to probation, in addition to a probationary term.   The sample size of sentenced

---

[32] *See* DE 55-1.

defendants is sufficient to conclude that the Government is seeking an exceptional sentence against Mr. Youngers.  It begs the question of whether Mr. Youngers' conduct is so out of the norm to impose such a significant sentence against him.  If numbers are an indicator, the Government believes that Mr. Youngers' conduct is so egregious that warrants a penalty of both imprisonment and probation.  For the reasons expressed herein, that is not the case.

### C.   Mr. Youngers' personal caractheristics also favor probation

There should be no doubt then that Mr. Youngers has shown remorse and has been intent on repenting for his inadequate conduct since his arrest date. This Honorable Court should take into consideration the contrition defendant displayed during both his interactions with the Government. He admits his misconduct.  He has irreversibly tarnished an otherwise pristine life as a hard working person and as a proud Veteran. The self-inflicted pain of knowing he failed the country he served, also exacts a heavy toll.  Mr. Youngers proudly served in the U.S. Military for three years in a noble role: as an Aviation Technician.  He was honorably discharged as a Corporal after serving a tour in Afghanistan.  He is most prideful of his service to his country.

But nothing gives him more pride than his relationships with his family and those relationships he musters as a roofing contractor while helping people who lost

everything after a weather catastrophe.   As friends and coworkers attest, Mr. Youngers is a kindhearted, loving, helpful, hardworking men who committed a horrible error in judgment as part of an historic event in the U.S. Capital.[33]   The aberrant conduct for which he is convicted should be treated as such, granting Mr. Youngers the opportunity to continue to work and build relationships.

Furthermore this Honorable Court should consider Mr. Youngers does not want to be excused for his crime.  Nevertheless, his history, within its proper context, should be considered when fashioning his sentence. Mr. Youngers is certainly redeemable. He can maintain steady employment, has the loving support of his family – who he presently takes care of – and the incentive to be better.  To that end – and considering the augmented risk caused by the COVID Pandemic emergency in the incarcerated population - we do not believe that a split sentence is a just result. Mr. Youngers pleads that this Honorable Court considers his character in conjunction with his conduct whilst fashioning his sentence.

Thus, Mr. Youngers fully recognizes the seriousness of the conduct for which he pled guilty. Hence, he is most willing to comply with his responsibility to this Honorable Court for his criminal conduct as part of his catharsis. Since his arrest date, and until the filing of this sentencing memorandum, Mr. Youngers has worked

---

[33] See attachments 1-3

hard to cleanse his only ill.  Mr. Youngers has no prior felony convictions. Generally, there is "no limitation ... on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for imposing an appropriate sentence." *U.S. v. Morgan*, 13-6025, 2015 WL 6773933, at *17 (10th Cir. 2015).

Therefore, this Honorable Court should therefore consider Mr. Youngers' whole life when fashioning his sentence; his aberrant conduct taken as an isolated event. *See, e.g., U.S. v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and upstanding life); *U.S. v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was "a law abiding citizen, who [did] an incredibly dumb thing"); *U.S. v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

## D.   Mr Youngers' post arrest consequences and certainty of prosecution are a most appropriate deterrence than incarceration

Mr. Youngers has already begun to learn his lesson. He has lived with significant restrictions on his life since this case initiated.  Since then, not only he has acknowledge the extent of his responsibility – he admitted to it immediately upon arrest – but also met with the Government and satisfy the requisites for his post plea debriefing. He has no incidents in pretrial release.   Mr. Youngers' self-

correction after arrest is in line with evolving understanding of how deterrence is best achieved in the criminal justice system. Studies tell us that the deterrent power of the *arrest* vastly outweighs the deterrent power of any punishment that comes later. One Department of Justice study concludes that the "certainty of being caught is a vastly more powerful deterrent than the punishment." USDOJ NATIONAL INSTITUTE OF JUSTICE, *Five Things About Deterrence*, (May 2016).[34]  Other studies confirm the same assessment. *See United States v. Presley*, 790 F.3d 699, 701-02 (7th Cir. 2015) (citing studies). The DOJ study found that sending someone to prison and increasing punishment "does little to deter crime," and even "may have the opposite effect." *Five Things About Deterrence, supra*.

To this point, the United States Sentencing Commission found in a comprehensive study on recidivism that individuals "with shorter lengths of imprisonment generally had lower recidivism rates." U.S. SENT. COMM'N. *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016) at 22.[35] There appears, therefore, to be no correlation between prison time and achieving deterrence or reducing recidivism.

---

[34]     *Available at*, https://www.ojp.gov/pdffiles1/nij/247350.pdf
[35]     *Available at*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

## IV.   CONCLUSION

As baseless as election fraud claims from the November 2020 election may have been, Mr. Youngers and many other Americans sincerely believed them. Despite his best effort to prevent further harm than what he inflicted by entering the Capitol Building on January 6th, Mr. Youngers was incapable to control his emotions, and succumbed to the mob mentality that took effect on every person who protested that day. He regrets interfering with officers and admits that his presence was a crime.  He also pleads that this Honorable Court consider that he stopped other individuals from causing harm to Capitol Police, and that those actions are more in keeping with his character

Given the fact that Mr. Youngers' post-offense conduct portrays a self-rehabilitation plan which involves treatment, work and family relations, we respectfully submit that a sentence of 12 months of probation is a more than adequate, sufficient but not greater than necessary sentence to accomplish the statutory directives embodied in Title 18 U.S.C. § 3553 (2018).  He can keep working and studying, and bettering his family relationship.  That is the end result he is most interested in.

**WHEREFORE,** and for the reasons expressed herein, this Honorable Court is in position to tailor a sentence that is sufficient but not greater than necessary to

achieve the statutory directives set forth in 18 U.S.C. § 3553 (20121).  Thus we

respectfully request this Honorable Court condemn the defendant to a sentence of

12 months of probation.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas No. 3233
Texas State Bar No. 14003750

**By /s/ Alex Omar Rosa-Ambert**
ALEX OMAR ROSA-AMBERT
Puerto Rico State Bar ID No. 15048
Southern District of Texas No. 3644073
Assistant Federal Public Defender
440 Louisiana, Suite 1350
Houston, Texas 77002-1056
Telephone:  713.718.4600
Fax: 713.718.4610
alex_rosa-ambert@fd.org
heather_hughes@fd.org

## CERTIFICATE OF SERVICE

I certify that on September 1, 2022, a copy of the foregoing was served by

Notification of Electronic Filing to all the parties of record.

/s/ Alex Rosa-Ambert
ALEX ROSA-AMBERT